AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
9/11/25
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MRV _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
9/11/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ IV _____ DEPUTY

United States of America,

v.

YING LIU,

    Defendant.

Case No.  2:25-mj-05647-DUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of February 12, 2025, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1029(a)(5) | Access Device Fraud $1,000+ |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Derek Wang*
*Complainant's signature*

Special Agent Derek Wang
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  09/11/2025

_____
*Judge's signature*

City and state: Los Angeles, California

Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kevin B. Reidy, x8536

## AFFIDAVIT

I, Derek Wang, being duly sworn, declare and state as follows:

### I.  BACKGROUND OF AFFIANT

1.    I am a Special Agent with the United States Secret Service ("USSS"), Department of Homeland Security ("DHS"), and have been so employed since November 22, 2021.  I am currently assigned to the HSI El Camino Real Task Force, where I investigate criminal violations related to federal institution fraud, including, but not limited to, wire fraud, access device fraud, identity fraud, computer fraud, and money laundering.

2.    In becoming a Special Agent, I have completed advanced criminal investigative training, including the Criminal Investigator Training Program from the Federal Law Enforcement Training Center in Glynco, Georgia.  I have also continued my extensive training at the James J. Rowley Training Center with the USSS in Beltsville, Maryland, including the Basic Investigation of Computer and Electronic Crime Program, Network Intrusion Triage and Response, and training on genuine currency printing and manufacturing process, and investigative techniques and tactics regarding financial crimes, cyber-crimes, and crypto-enabled fraud.  Prior to my tenure as a Special Agent, I was employed as a Senior Cyber Consultant and Anti-Money Laundering Specialist at Deloitte and Ernst & Young for over five years with experience in penetration and vulnerability testing, business continuity, disaster recovery, networking, security incident and event management, phishing attacks,

ransomware, social engineering, Red Hat Operations, and anti-money laundering projects (Know Your Customer and Financial Crimes Prevention) for large financial institutions.

## II. PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of criminal complaints and arrest warrants for Ying LIU ("LIU") and Melisa Abigail AGUILAR-CENTES ("AGUILAR") for a violation of 18 U.S.C. § 1029(a)(5) (access device fraud in excess of $1,000).

4.    This affidavit is also made in support of applications for warrants to search the following:

a.    The premises located at 316 Lockhart Way, West Covina, CA 91790 ("**SUBJECT PREMISES 1**"), which is believed to be the primary residence of LIU and Guanghui SU ("SU"), as described more fully in Attachment A-1;

b.    The premises located at 6662 Tujunga Avenue APT 1, North Hollywood, CA 91606 ("**SUBJECT PREMISES 2**"), which is believed to be the primary residence of AGUILAR, as described more fully in Attachment A-2;

c.    A BMW vehicle bearing California license plate 9HRW032 and VIN 5UX43DP08R9T43023 ("**SUBJECT VEHICLE 1**"), which is registered to LIU at the **SUBJECT PREMISES 1**, as described more fully in attachment A-3;

d.    A Volkswagen vehicle bearing California license plate 9FAJ155 and VIN 1VWSA7A37LC011472 ("**SUBJECT VEHICLE 2**"), which is registered to AGUILAR at **SUBJECT PREMISES 2**, as described more fully in Attachment A-4;

e.   The person of LIU, as described more fully in Attachment A-5;

f.   The person of SU, as described more fully in Attachment A-6; and

g.   The person of AGUILAR, as described more fully in Attachment A-7.

5.   The requested warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1029(a)(2) (trafficking in unauthorized access devices obtaining $1,000), 1029(a)(3) (possession of 15 or more counterfeit or unauthorized access devices); 1029(a)(5); (access device fraud in excess of $1,000); and 371 (Conspiracy) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A-1 through A-7 and Attachment B are incorporated herein by reference.

6.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times listed are on or about those indicated.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   Target Reports Extensive Gift Card Fraud Scheme to Law Enforcement**

7.    HSI received an investigative lead from Target Corporation, the operator of Target retail stores, detailing a large-scale and organized gift card fraud ring carried out by multiple suspects throughout the Central District of California. Target reported that the total amount of loss resulting from the fraud exceeded $6 million.

8.    Based on my conversations with Target, my review of transactional data, surveillance footage, and other records provided by Target, and my training and experience in fraud investigations, I believe this fraud generally operated in six distinct phases.

   a.   First, suspects stole inactive Target gift cards in their packaging from Target stores.

   b.   Second, suspects removed the stolen gift card from the packaging, extracted sensitive gift card account information from the card, and placed the tampered card back into the packaging.

   c.   Third, suspects placed the tampered gift cards in the packaging back onto Target store shelves.

   d.   Fourth, suspects performed balance inquiries on the tampered cards to learn when the tampered cards were legitimately purchased by another person who then added money onto the cards.  Once money had been added to the tampered cards, that information is disseminated to co-conspirators so

they can use the money on the tampered cards as quickly as possible before the legitimate purchaser can deplete the funds on the card.

      e.    Fifth, after legitimate purchasers of the gift cards loaded money into the tampered cards, suspects used the stolen gift card account information to buy high-value electronic devices at Target retail locations.

      f.    Sixth, suspects shipped the fraudulently obtained merchandise elsewhere for resale and profit.

    9.    Based on my training, experience, and participation in this investigation, I know that multiple nationwide retailers such as Target have observed organized fraud rings consisting primarily of Chinese nationals which perpetrate large-scale gift card fraud at retail locations throughout the United States. Based upon this wide-spread issue, several retailers are participating in proactive initiatives with law enforcement to investigate and prevent this fraud.

    **B.    November 2023 — LIU and AGUILAR Use Stolen Target Gift Card Account Numbers to Purchase Thousands of Dollars in High-Priced Electronics**

    10.    Between on or about November 11, 2023, and November 24, 2023, Target surveillance video and transaction records show that LIU and an accomplice made in-store purchases of approximately 564 high-value Apple electronic devices worth approximately $163,824.36 using money loaded onto Target gift card account numbers after they were legitimately purchased by other customers.

11.  According to Target, a cashier must input a unique ID into the register prior to use.  Target transaction records, which contain a reference to the unique ID of the cashier used to process each transaction, show that all of these purchases were processed at the same Target store and by the same cashier— AGUILAR.  In processing these transactions, AGUILAR marked down the pricing on the purchased Apple electronics so that LIU and her accomplice received nearly $60,000 in discounts and paid only $106,936.49.

12.  AGUILAR worked as a cashier at a Target store located at 1033 N. Hollywood Way in Burbank between January 18, 2022, and October 24, 2024, the day she quit her job at Target. During her tenure, Target flagged AGUILAR for performing excessive markdowns on high-value electronic devices, particularly Apple products.  Target's markdown analysis showed that 88% of Aguilar's marked-down transactions involved customers paying with Target gift cards and 96% of her marked-down transactions involved the sale of Apple products.

13.  The circumstances of the transactions demonstrate that AGUILAR and LIU repeatedly worked together to use money loaded onto stolen gift card account numbers to fraudulently obtain high-value Apple products.

14.  For example, on or about November 15, 2023, surveillance video showed that AGUILAR placed approximately 120 high-value Apple electronic devices into several shopping carts and parked the carts behind her checkout counter.  Several minutes later, LIU and another female suspect are shown greeting

AGUILAR.  Over the course of the next 45 minutes, LIU and the female suspect used over one hundred Target gift card account numbers that had been loaded onto a Target account in order to purchase over one hundred Apple products.[1]  AGUILAR performed a manual discount markdown on the high-value Apple electronic devices purchased by LIU and her accomplice on November 15, 2023, bringing the total purchase price down from $39,728.97 to $28,896.40, a total discount of $10,832.57.

15.  I reviewed hours of surveillance footage from this and other transactions described in this affidavit, compared the images of the women I saw there with LIU's and AGUILAR's DMV photographs as well as pictures associated with LIU's and AGUILAR's social media accounts, and determined that LIU was one of the women shown making the purchases with AGUILAR.  I then compared the pictures from LIU's and AGUILAR's DMV and social media accounts to surveillance footage, and I believe them to be the same women.



---

[1] Target representatives found this to be unusual because cashiers do not typically place large numbers of high-value Apple products near their checkout counter before a customer's arrival.

16.  Similarly, on November 18, 2023, LIU used 45 Target gift card account numbers legitimately purchased by other persons to buy another 64 high-value Apple electronic devices from AGUILAR.  The products LIU and and an accomplice purchased retailed for approximately $22,929.36.  AGUILAR, using her unique employee ID, applied cashier-controlled discounts to markdown the final transaction total to approximately $15,839.12.

17.  On November 22, 2023, LIU used approximately $12,000 in funds loaded onto 32 Target gift card account numbers legitimately purchased by other persons to buy high-value Apple electronic devices from AGUILAR.  The devices LIU bought retailed for approximately $43,748.25.  AGUILAR, using her unique employee ID, applied cashier-controlled discounts to markdown the final transaction total to approximately $26,526.18.  LIU also used $14,145.30 in cash to complete the transaction with AGUILAR.[2]

18.  The Target guest profiles used to make these November 2023 purchases further point to LIU and her husband, SU.

a.  LIU and her accomplice primarily utilized two Target guest profiles for these purchases.  The first profile's email is "AQIANGHK1@gmail.com" with the guest name "hui su" and Guest ID 20098729451.  The guest name appears to be a shortened version of SU's full name, Guanghui SU.  Additionally, "hui su"

---

[2] This is the only transaction described in this affidavit where LIU used cash.

is used on multiple other Target guest profiles that Target identified as associated with this fraud scheme.

b.   The "AQIANGHK1@gmail.com" account was one of 946 Target online accounts associated with this fraud scheme that were created or accessed from a single IP address — 47.145.138.120 ("the Suspect IP Address").  The Suspect IP Address has created and registered Target online accounts associated with fraudulently obtained Target gift cards which have been used for more than approximately $2 million in purchases.

i.   Based upon records from Frontier Communications, the internet service provider for the Suspect IP Address, the Suspect IP Address is a residential IP address assigned to LIU and SU's address, **SUBJECT PREMISES 1**.

ii.   According to the Frontier Communications records, LIU is the named accountholder for the Suspect IP Address.  According to law enforcement database queries, both LIU and SU list **SUBJECT PREMISES 1** as their address on their California driver's licenses.

c.   The second profile's email is 1172799710@qq.com, with the guest names "HUI SU" and "guanhui su", and Guest ID 20085413452.  Again, the guest names are consistent with SU's full name, Guanghui SU.  This second profile lists both shipping and billing addresses matching **SUBJECT PREMISES 1**.  The Suspect IP Address accessed this profile to check fraudulent gift card balances and add those fraudulent funds to the profile.

**C.    October 2024 – AGUILAR and LIU Continue Their Gift Card Fraud, This Time Both as Purchasers**

19.    In late October 2024, just before AGUILAR quit her job at Target, she and LIU traveled to multiple Target stores to use stolen gift card account numbers to purchase high-value Apple electronics.

20.    On October 21, 2024, LIU and AGUILAR traveled to a Target store in Rosemead and used approximately 27 Target gift card account numbers legitimately purchased by other persons to buy high-value electronics totaling approximately $1,032.23.

21.    All 27 of the fraudulently obtained gift cards used at the Rosemead Target were added to a Target online account created using the Suspect IP Address on or about October 21, 2024, the same date the cards were used in-store.

22.    Later that same day, LIU and AGUILAR are shown on video surveillance at a Target store in Commerce, California utilizing approximately 43 Target gift card account numbers legitimately purchased by other persons to buy high-value electronics totaling approximately $1,987.49.

23.    All 14 of the fraudulently obtained gift cards used by LIU and AGUILAR at the Commerce Target were added to a Target online account created using the Suspect IP Address on or about October 21, 2024, the same date the cards were used in-store.

24.    On or about October 22, 2024, LIU went to a Target store located at 1302 South La Brea Avenue and conducted multiple purchases of Apple products using fraudulently obtained gift card account numbers.

a.   In one transaction, LIU used approximately 61 Target gift card account numbers legitimately purchased by other persons to buy high-value electronics totaling approximately $1,663.22.

b.   In another transaction, LIU used approximately 50 Target gift card account numbers legitimately purchased by other persons to buy high-value electronics totaling approximately $2,093.91.

c.   In still another transaction, LIU used approximately 57 Target gift card account numbers legitimately purchased by other persons to buy high-value electronics totaling approximately $3,101.74.

25.  All of the fraudulently obtained gift cards used at the South La Brea Target were added to a Target online account created using the Suspect IP Address on or about October 22, 2024, the same date the cards were used in-store.

**D.   February-April 2025 – LIU and AGUILAR Continue the Gift Card Fraud**

26.  LIU and AGUILAR have continued to work together to defraud Target in recent months.

27.  On February 12, 2025, surveillance video captured a Tesla vehicle bearing California license plate 9RKW421 (the "LIU TESLA") at Target stores in Commerce, Manhattan Beach, Baldwin Park, Rosemead, Pico Rivera, Redondo Beach, Carson, and Signal Hill.  At the time, California DMV records listed LIU and SU as the registered owners of the LIU TESLA at **SUBJECT PREMISES 1**.[3]

---

[3] LIU subsequently sold the LIU TESLA to Carmax on July 11, 2025.

AGUILAR can be seen on surveillance riding in the passenger side of LIU TESLA, the license plate of which (9RKW421) is visible.

 

28.  Also on February 12, 2025, LIU and AGUILAR were captured on in-store surveillance at these same 8 Target stores using approximately 71 Target gift card account numbers legitimately purchased by other persons to buy high-value electronic devices totaling approximately $11,461.69.

29.  All 71 of these gift cards used on or about February 12, 2025, were added to multiple Target online accounts created using various IP addresses, but the Suspect IP Address successfully logged into all Target accounts and established one-time password (OTP) access after account creation. Establishment of OTP access for a Target account signifies that the user is in control of that particular Target account.

30.  On or about February 13, 2025, **SUBJECT VEHICLE 1** is observed on surveillance at approximately 10 different Target stores, including locations in Culver City, West Covina, Rosemead and El Monte.  LIU and AGUILAR were captured on in-store surveillance using approximately 47 Target gift card account numbers legitimately purchased by other persons to buy $5,481.82 of Apple products.  All cards used by LIU and AGUILAR

on February 13, 2025, were associated with a Target account that was accessed via the Suspect IP Address.

 

31.    On or about March 5, 2025, LIU was captured on video surveillance at a Target store in Fullerton utilizing five Target gift card account numbers legitimately purchased by other persons to buy high-value electronics totaling approximately $1,080.52.  The fraudulent gift cards were linked to a Target guest profile that was accessed and utilized by the Suspect IP Address.



32.    On or about April 21, 2025, LIU and AGUILAR went to a Target in the Eagle Rock neighborhood of Los Angeles and used

four Target gift card account numbers legitimately purchased by other persons to buy high-value electronics totaling $428.38.



**E.    Evidence Suggests SU Is Likely Involved in the Target Gift Card Fraud**

33.    Based on my investigation, I believe that LIU's husband, SU, is also involved in the gift card fraud.

a.    LIU and SU are married and live together at **SUBJECT PREMISES 1**.  According to Immigration and Customs enforcement, LIU submitted an immigration application for SU to obtain lawful permanent resident status based on their marriage.

b.    According to law enforcement database queries, LIU was born in China, entered the United States in 2011, and became a naturalized citizen of the United States in 2019. LIU boarded three (3) roundtrip flights between the United States and China from 2016 to 2018.  LIU boarded two (2) roundtrip flights between the United States and Nicaragua in 2024 and one (1) roundtrip flight between the United States and Egypt in 2024.

c.    According to law enforcement database queries, SU was born in China, entered the United States in 2016, and is a Chinese national.  SU failed to board his one-way flight from the United States to China in 2016, and he is currently an illegal overstay immigrant.

d.    According to law enforcement database queries, the address listed on both LIU and SU's driver's licenses is **SUBJECT PREMISES 1.**

e.    LIU and SU own a business, Yinghui Wholesale Inc, which is a wholesale shipping company that was incorporated on February 21, 2025.  According to publicly available California Secretary of State records, Yinghui Wholesale Inc. is an active registered corporation in California with a listed address of **SUBJECT PREMISES 1.**  LIU is listed as the CEO and CFO, and SU is listed as the Secretary.

34.  SU was captured on Target surveillance footage engaging in fraudulent Target gift card transactions with LIU. On or about March 30, 2025, LIU and SU can be observed on video surveillance at a Target store in Los Angeles utilizing approximately six Target gift card account numbers legitimately purchased by other persons to buy high-value electronics totaling approximately $1,045.80.

35.  LIU and SU utilized a Target Team Member 10% discount for this transaction. LIU and SU were not and have never been Target employees. This is just one of several examples of LIU and SU using unauthorized discounts on their fraudulent

transactions to increase the purchasing power of their fraudulently obtained gift card funds.

 

**F.   LIU and SU Still Live at SUBJECT PREMISES 1 and Drive SUBJECT VEHICLE 1**

36.   The Suspect IP Address, registered to LIU at **SUBJECT PREMISES 1**, is still actively logging into Target online accounts as recently as on or about July 9, 2025.

37.   Both LIU and SU list **SUBJECT PREMISES 1** as their address on their California driver's licenses.

38.   The listed address for LIU and SU's business, Yinghui Wholesale, Inc., is **SUBJECT PREMISES 1**.

39.   ECR Task Force members conducted surveillance at **SUBJECT PREMISES 1** on or about April 21, 2025, and observed LIU driving LIU TESLA and LIU backing LIU TESLA into the attached garage of the **SUBJECT PREMISES 1**.  Additionally, AGUILAR was inside LIU TESLA with LIU.

40.   ECR Task Force members conducted surveillance at the **SUBJECT PREMISES 1** on or about July 16, 2025, and observed a package from Target outside the front door of the **SUBJECT PREMISES 1**.  According to Target, on July 12, 2025, an order was placed using the Suspect IP Address and was delivered to SU at

the **SUBJECT PREMISES 1**. The package was delivered to the front door of the **SUBJECT PREMISES 1** on July 14, 2025.

41.  On July 16, 2025, ECR Task Force members observed SU driving **SUBJECT VEHICLE 1** with LIU as the passenger into the attached garage of **SUBJECT PREMISES 1**.  Agents also saw a package from Target outside the front door of **SUBJECT PREMISES 1**.  According to Target, on July 12, 2025, an order was placed using the Suspect IP Address and was delivered to SU at the **SUBJECT PREMISES 1**. The package was delivered to the front door of the **SUBJECT PREMISES 1** on July 14, 2025.

42.  According to the California Department of Motor Vehicles, **SUBJECT VEHICLE 1** is registered to LIU at the **SUBJECT PREMISES 1**.

> **G.    AGUILAR Still Lives at SUBJECT PREMISES 2 and Drives SUBJECT VEHICLE 2**

43.  According to the California Department of Motor Vehicles, **SUBJECT VEHICLE 2** is registered to AGUILAR at the **SUBJECT PREMISES 2**.

44.  ECR Task Force members conducted surveillance at the **SUBJECT PREMISES 2** on or about August 28, 2025, and observed AGUILAR, wearing what appeared to be grey-colored scrubs, leaving **SUBJECT PREMISES 2** in the morning.  ECR Task Force members followed AGUILAR to a medical plaza and observed AGUILAR walking into an optometry clinic.

## IV. <u>TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT AND ACCESS DEVICE FRAUD</u>

45.   Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft and access device fraud, I know the following:

a.   It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information or "profiles," often for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.   It is a common practice for those involved in access device fraud or bank fraud to use either false identification or stolen real identification to make purchases

with stolen access devices at retail stores in order to avoid detection and to complete the transaction.  Those who engage in such fraud keep evidence of such retail transactions on their person.

c.    It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.  Such equipment and software are often found on fraudsters' persons and on their digital devices.

d.    Oftentimes mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

46.  Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

## V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

47.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

48.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remains on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

49.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

50.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

51.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

a.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

21

i.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

ii.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

b.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

i.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To

22

unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

ii. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

iii. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LIU's, SU's, or AGUILAR's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of LIU's, SU's, or AGUILAR's face with his/her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

c.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VI. <u>CONCLUSION</u>

52.   For the reasons described above, there is probable cause to believe that LIU and AGUILAR committed a violation of 18 U.S.C. § 1029(a)(5) (access device fraud in excess of $1,000).  There is also probable cause that the evidence, fruits, and instrumentalities of the Subject Offenses described in Attachment B will be found in a search of the **SUBJECT PREMISES 1, SUBJECT PREMISES 2, SUBJECT VEHICLE 1, SUBJECT VEHICLE 2,** the person of LIU, the person of SU, and the person of AGUILAR as described in Attachments A-1, A-2, A-3, A-4, A-5, A-6, and A-7.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 11th day of September 2025.

_____
HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE